UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

BARBARA DEGENNARO,

       Plaintiff,

                                           CASE NO. 1:06-CV-354

v.

                                           HON. ROBERT J. JONKER

LIBERTY LIFE ASSURANCE
COMPANY OF BOSTON,

       Defendant.
_____/

## OPINION

Plaintiff Barbara DeGennaro brings this action for disability benefits against Liberty Life Assurance Company of Boston ("Liberty Life") under 29 U.S.C. § 1132(a)(1)(B), a civil enforcement provision of the Employee Retirement Income Security Program ("ERISA"). Before the Court is Defendant Liberty Life's Motion for Entry of Judgment (docket # 19). The Court heard oral argument on the Motion (docket ## 24, 25), and its decision follows.

**Background**

Ms. DeGennaro is approximately forty-four years old and resides in Kent County, Michigan. (Compl., docket # 1, ¶ 1; Pl.'s Br. in Supp. of J. on the R., docket # 18, at 1.) She has a number of medical problems, including morbid obesity, sleep apnea, sinus tachycardia, migraine headaches, degenerative joint disease in both knees, asthma and other

respiratory problems, and general deconditioning. (Pl.'s Br. in Supp. of J. on the R., docket # 18, at 1-2.) Spectrum Health ("Spectrum") formerly employed Ms. DeGennaro as a billings and collections clerk. (Mem. of Def. Liberty Life in Supp. of Mot. for Entry of J., docket # 20, at 2.) As a Spectrum employee, Ms. DeGennaro was insured under a group disability income policy issued by Liberty Life (the "Spectrum LTD Policy"). (*Id.*)

The Spectrum LTD Policy has a 180-day elimination period, meaning that benefits are not payable under the policy for the first 180 days following the date the disability leave begins. (*Id.*) The Policy provides that for the first twenty-four months following the elimination period, benefits are payable as long as the participant's condition precludes her performing the material and substantial duties of her own occupation. (*Id.*) The Policy defines "own occupation" as "the Covered Person's occupation that [s]he was performing when [her] Disability . . . began. For the purposes of determining Disability under this policy, Liberty will consider the Covered Person's occupation as it is normally performed in the national economy." (A.R. LL-12.) To be eligible for benefits following the twenty-four month period, a participant's condition must preclude her from performing the material and substantial duties of any job. (Mem. of Def. Liberty Life Assurance Co. of Boston in Supp. of Mot. for Entry of J., docket # 20, at 2-3.)

### 1. Initial Decision Awarding Benefits

Ms. DeGennaro began a disability leave from Spectrum on May 17, 2004 due to knee pain, shortness of breath, fatigue, racing heartbeat and sleep apnea. (*Id. at 2*, citing A.R. LL-518-519, 530.)  Liberty Life received notice on September 24, 2004, of Ms. DeGennaro's claim for benefits under the Spectrum LTD Policy, and requested information from her health care providers to evaluate her eligibility for benefits. (*Id*. at 2-3.)  Based on information from Ms. DeGennaro and her primary care physician, Dr. Norman Weber, Liberty Life approved Ms. DeGennaro's claim for long-term disability benefits effective upon the expiration of the eligibility period on November 13, 2004. (*Id*. at 3.)

### 2. Medical Review

#### a. Treating Physician Reports

Consistent with company practice, Liberty Life continued to monitor Ms. DeGennaro's condition. (*Id*.)  Early in 2005, Liberty Life requested updated information from her treating physicians, including Dr. Weber. (*Id*.)  Dr. Weber completed multiple Liberty Life forms in response to the request. (AR LL-417, 436, and 437.)  On one form, dated February 24, 2005, Dr. Weber described Ms. DeGennaro's primary diagnosis as degenerative joint disease of the knees and her prognosis as "guarded." (A.R. LL-436.)  He also indicated that she was receiving treatment for obstructive sleep apnea. (A.R. LL-436.)  He checked a box describing her physical impairment as involving "moderate limitation of functional capacity; capable of clerical/administrative activity." (A.R. LL-436.)

Dr. Weber's responses on another form, dated April 5, 2005, appear inconsistent: asked "[c]an Ms. DeGennaro return to work in a sedentary position with or without a wheelchair," he answered "yes," but asked "[d]oes sleep apnea prevent Ms. DeGennaro from returning to work," he also answered "yes." (A.R. LL-417.) In this form he described the primary diagnosis for her impairment as obstructive sleep apnea. (A.R. LL-417.)

      **b.**      **Consulting Physician Review**

Liberty Life forwarded these responses and the rest of Ms. DeGennaro's medical file to one of its consulting physicians, Dr. Thomas Cuevas, for review. (Mem. of Def. Liberty Life Assurance Co. of Boston in Supp. of Mot. for Entry of J., docket # 20, at 3.) The file included various medical records, including reports of two sleep studies performed on Ms. DeGennaro in August and September of 2004. (A.R. LL-401.) Other than volunteer work, Dr. Cuevas does not have an active patient practice and works exclusively for Liberty Life. (Factual Stipulation, docket # 17, at 2.) Dr. Cuevas reported on August 2, 2005, that he had reviewed Ms. DeGennaro's file in its entirety, and that "the current information does not establish that she is impaired in the physical capacity to perform sedentary work." (A.R. LL-401.) He suggested evaluation by a board-certified sleep specialist. (A.R. LL-400.)

Liberty Life then forwarded Ms. DeGennaro's records to Dr. James Bradley, who specializes in pulmonary and sleep medicine. (Mem. of Def. Liberty Life Assurance Co. of Boston in Supp. of Mot. for Entry of J., docket # 20, at 4.) Dr. Bradley has an active patient practice and also consults with Liberty Life. (Factual Stipulation, docket # 17, at 2.)

4

Following his review of the two sleep studies performed on Ms. DeGennaro and other medical records, Dr. Bradley reported in an undated memorandum that "the level of sleep apnea noted in the medical records is not severe enough to be expected to adversely impact her life activities including sedentary activities such as speaking on the telephone, using a keyboard, or manipulating papers and files." (A.R. LL-386-87.)

### 3.     Initial Decision Terminating Benefits

After receiving Dr. Bradley's memorandum, Liberty Life on January 20, 2006, issued a decision terminating Ms. DeGennaro's long-term disability benefits. (Mem. of Def. Liberty Life Assurance Co. of Boston in Supp. of Mot. for Entry of J., docket # 20, at 5.) In the termination letter, Liberty Life stated that Ms. DeGennaro did not meet the definition of "disabled" under the Policy, adding that "[o]ur review of your claim was based on your current restrictions and limitations due to your disabling condition of sleep apnea." (A.R. LL-383.) The termination letter did not mention any other medical conditions, although Dr. Weber had reported on other conditions and Dr. Cuevas had considered them. The termination letter also described the process for appeals of the termination. (A.R. LL-383.)

### 4.     Administrative Appeal and Review

Ms. DeGennaro replied promptly to Liberty Life, stating that the decision to terminate was wrong and did not take into account all material information. (A.R. 372-73.) Among other things, she noted that her potentially disabling conditions included problems beyond sleep apnea. (A.R. 372.) She added that her occupation was not actually sedentary, but

5

rather required her to be on her feet approximately 60% of the day.  (A.R. 372.) Ms. DeGennaro also retained counsel, who submitted additional medical records to support Ms. DeGennaro's appeal of the denial of benefits.  (*See* Mem. of Def. Liberty Life in Supp. of Mot. for Entry of J., docket # 20, at 6.)

Liberty Life's appeal consultant forwarded these records along with the rest of Ms. DeGennaro's file to another physician consultant, Dr. Robert Millstein.  (*Id*. at 7.) Dr. Millstein does not have an active patient practice but rather works exclusively for Liberty Life.  (Factual Stipulation, docket # 17, at 2.)  Liberty Life specifically asked Dr. Millstein to consider whether, taking into account all of Ms. DeGennaro's conditions, she had the functionality to perform a sedentary occupation, though it told him there was no need to address the diagnosis of sleep apnea.  (A.R. LL-219.)

Dr. Millstein appears to have reviewed Ms. DeGennaro's medical file in its entirety. Dr. Millstein then discussed Ms. DeGennaro's condition with her treating physician, Dr. Weber, on April 21, 2006.  (Mem. of Def. Liberty Life in Supp. of Mot. for Entry of J., docket # 20, at 7.)  After their conversation, Dr. Millstein sent Dr. Weber a brief letter summarizing the discussion and concluding, "[i]f you agree with the above representation of our telephone call, please sign and date a copy of this letter and return it to me . . . Please make any corrections or additions in the margins, as you deem appropriate."  (A.R. LL-194.) The letter included the statement, "[y]ou feel she has the physical ability to do her sedentary job." (*Id*.)  A few days went by without a response from Dr. Weber.  There is no indication

6

that Dr. Millstein followed up with Dr. Weber. On April 26, 2006, without having heard further from Dr. Weber, Dr. Millstein submitted a report to Liberty Life stating, among other things, that "Dr. Weber agrees that the claimant retains the physical capacity to perform full time sedentary work." (A.R. LL-199.)

### 5. Administrative Decision Rejecting Appeal and Affirming Denial of Benefits

On May 4, 2006, Liberty Life sent a detailed letter to Ms. DeGennaro denying her appeal. (*Id*. at LL-183.) The letter evidently crossed in the mail with a letter of the same date from Dr. Weber, in which Dr. Weber advised Dr. Millstein, "I do not believe your proposed letter fully represents my views in regard to Barbara DeGennaro's current condition."[1] (*See* A.R. LL-180.) Dr. Weber elaborated, "[i]n general, Ms. DeGennaro continues to suffer from obesity, joint disease, sleep apnea, sinus tachycardia, and progressive deconditioning." (A.R. LL-180.) He also noted, "I have prescribed narcotics for her ongoing pain, and these necessary pain medications may additionally contribute to her daytime sleepiness. Understandably, this aggravates the hypersomnolence from obstructive sleep apnea." (A.R. LL-180.) Dr. Weber added that Ms. DeGennaro also continued to suffer from "obesity, joint diseases in both knees, intermittent asthma, migraine headaches, sleep apnea, sinus tachycardia, and progressive deconditioning." (A.R. LL-180.) Dr. Weber concluded, "[b]ecause of her multiple problems, after consideration, I do not

---

[1] Dr. Weber's letter is dated May 4, 2006, but was faxed to Liberty Life on May 8, 2006.

7

believe that she would be able to handle any gainful employment at the present time." (A.R. LL-180.)

Dr. Millstein addressed Dr. Weber's May 4, 2006 letter in a May 8, 2006 addendum to his earlier report. (A.R. LL-178.) In the addendum, Dr. Millstein stated, "[i]n his May 4, 2006 letter Dr. Weber reiterates his opinion that in this case narcotics aggravate hypersomnolence from obstructive sleep apnea." (A.R. LL-178.) Dr. Millstein said little about the issue Dr. Weber raised, remarking only that "[i]n a previous report pulmonary and sleep medicine specialist Dr. Bradley opined that the record did not support impairment due to sleep apnea." (A.R. LL-178.) Dr. Bradley's report did not, though, address whether prescription medication might aggravate the soporific effects of sleep apnea, nor did it consider the potential impact of Ms. DeGennaro's medications. (See A.R. LL-386-387.) Dr. Millstein's opinion that the medical record supports Ms. DeGennaro's ability to perform sedentary work did not change. (A.R. LL-178.)

  **6.**  **Final Decision Denying Benefits**

After Ms. DeGennaro received Liberty Life's May 4, 2006 termination letter, her attorney contacted Liberty Life to bring Dr. Weber's May 4, 2006 letter to its attention. (A.R. LL-175-176.) Without mentioning Dr. Millstein's May 8, 2006 addendum, Liberty Life responded on May 16, 2006 that Ms. DeGennaro's appeal had received full and fair consideration and that no materials received after May 4, 2006 would be considered. (A.R. LL-170-171.) Ms. DeGennaro filed this suit on May 22, 2006. With the Court's approval,

the parties agreed to re-open the Administrative Record so that Liberty Life could reconsider its decision to deny benefits in light of Dr. Weber's May 4, 2006 letter and any additional materials Ms. DeGennaro wished to submit. (*See* Order of July 28, 2006, docket # 7.) On August 25 2006, her attorney submitted a detailed letter arguing that Liberty Life should reinstate Ms. DeGennaro's disability benefits and noting that he was unaware of any pertinent medical records Liberty Life did not already have. (A.R. LL-107.)

On September 14, 2006, Liberty Life notified Ms. DeGennaro that it had reviewed her entire claim file, considered the points raised in her attorney's August 25, 2006 letter, and determined that she was ineligible for benefits. (A.R. LL-77-82.) The denial letter reviews the points Ms. DeGennaro's attorney had raised, Ms. DeGennaro's various conditions, and Dr. Millstein's addendum of May 8, 2006. (A.R. LL-77-82.) The letter addresses each of Ms. DeGennaro's conditions discretely; it does not address the potential cumulative impact of her various conditions. Nor does the letter discuss the possibility that her medications exacerbate hypersomnolence. (*See* A.R. LL-77-82.) The current litigation proceeded.

## Legal Standard

Courts ordinarily review an ERISA plan administrator's decision to deny benefits *de novo*. *Evans v. Unum Provident Corp.*, 434 F.3d 866, 875 (6th Cir. 2006) (citing *Jones v. Metro. Life Ins. Co.*, 385 F.3d 654, 659-60 (6th Cir. 1998)). However, where an ERISA plan administrator has discretionary authority to determine eligibility for benefits or construe

the plan terms, courts apply instead a highly deferential arbitrary and capricious standard of review. *Id*. (quoting *Killian v. Healthsource Provident Adm'rs, Inc*. 152 F.3d 514, 520 (6th Cir. 1998). The parties agree that an arbitrary and capricious standard applies in this case, because the Spectrum LTD Policy explicitly provides, "Liberty shall possess the authority, in its sole discretion, to construe the terms of this policy and to determine benefit eligibility hereunder." (*See* A.R. LL-45.)

The arbitrary and capricious standard "'is the least demanding standard of review of administrative action...When it is possible to offer a reasoned explanation, based on the evidence, for a particular outcome, that outcome is not arbitrary and capricious.'" *Evans,* 434 F.3d at 876 (quoting *Killian*, 152 F. 3d at 520). Therefore, "a decision will be upheld 'if it is the result of a deliberate principled reasoning process, and if it is supported by substantial evidence.'" *Id*. (quoting *Killian*, 152 F.3d at 520). The Sixth Circuit has, though, in recent years emphasized that although the arbitrary and capricious standard is deferential, it nonetheless has teeth. *Id.* (citing *McDonald v. Western-Southern Life Ins. Co.*, 347 F.3d 161, 172 (6th Cir. 2003)). "'[M]erely because our review must be deferential does not mean our review must also be inconsequential. While a benefits plan may vest discretion in the plan administrator, the federal courts do not sit in review of the administrator's decisions only for the purpose of rubber stamping those decisions.'" *Id*. (quoting *Moon v. Unum Provident Corp*., 405 F.3d 373, 379 (6th Cir. 2005)). Courts reviewing the administrative record to determine whether a plan administrator acted

arbitrarily and capriciously are to consider the medical evidence in the administrative record and the opinions on both sides of the issues. *Id*. (citing *McDonald*, 347 F.3d at 172).

The United State Supreme Court has just reaffirmed these general principles and emphasized that even in cases involving arbitrary and capricious review, concepts of trust law and fiduciary duty must undergird the decision on whether to grant or deny benefits. *Metro. Life Ins. Co. v. Glenn*, No. 06-923, 2008 WL 2444796, at *4-*5 (U.S. June 19, 2008). In cases like this one, where an insurance company serves as both the decision-maker on a benefits decision and the payee of any benefits awarded, the Court must be mindful of the inherent conflict of interest and consider it as one factor in the analysis. *Id*. at *3.

**Analysis**

Liberty Life certainly conducted a thorough review of Ms. DeGennaro's medical records. Dr. Cuevas considered each of her conditions; Dr. Bradley, a sleep specialist, analyzed her sleep studies; and Dr. Millstein reviewed each of her conditions except sleep apnea, deferring to Dr. Bradley's report in that regard. On the surface, Liberty Life appears to have proceeded appropriately. But fundamental problems with Liberty Life's review emerge on closer inspection. In particular, the record does not demonstrate that Liberty Life fully and fairly considered the potentially disabling impact of the combined effects of Ms. DeGenaro's multiple medical conditions, as opposed to the particular impact of each separate condition in isolation, and of the effects of her medications. Accordingly, on this

record the Court cannot find that a final decision denying benefits satisfies arbitrary and capricious review. However, on this record, the Court cannot conclude as a matter of law that benefits are necessarily appropriate under the plan either. Further administrative review is necessary focusing particularly on the combined impact of Ms. DeGenarro's multiple conditions, and on the effects of her medications, as further described in this opinion. The Court will vacate the final decision denying benefits and remand for further administrative review consistent with this opinion, as provided in *Smith v. Cont'l Cas. Co.*, 450 F.3d 253, 265 (6th Cir. 2006).

*Use of File Reviews*

The Sixth Circuit has found "nothing inherently objectionable about a file review by a qualified physician in the context of a benefits determination, even where a file review results in conclusions different from those of a treating physician." *Calvert v. Firstar Finance, Inc.*, 409 F.3d 286, 296-297 (6th Cir. 2005). Although the Spectrum LTD Plan gave Liberty Life the right to have a claimant examined by a physician of Liberty Life's choice, the Spectrum LTD Plan did not require Liberty Life to do so. *See id.* at 295. Liberty Life's decision to conduct a file review rather than a direct examination is "just one more factor to consider in [the] overall assessment of whether [Liberty Life] acted in an arbitrary and capricious fashion." *Id*. However, when chart reviews are siloed, as happened in Ms. DeGennaro's case, there is a risk of material omission. In Ms. DeGennaro's situation, a direct examination by a physician of Liberty Life's choosing, as permitted by the Spectrum

LTD Plan, could have given Liberty Life a more complete picture of her health. This is important because each of her conditions, as a discrete issue, might not create a disability, but her physician had made it clear to Liberty Life that the totality of her conditions as well as her medications created the disability.

The *Calvert* court stated that "the failure to conduct a physical examination – especially where the right to do so is specifically reserved in the plan – may, in some cases, raise questions about the thoroughness and accuracy of the benefits determination." *Calvert*, 409 F.3d at 295. Liberty Life asserts that an independent medical exam "would have served no purpose," because sleep apnea was her primary disabling condition and sleep studies had already been conducted. (Def.'s Response to Pl.'s Brief in Supp. of J. on Record, docket # 22, at 7.) This argument overlooks Dr. Weber's explicit mention in his May 4, 2006 letter that the totality of Ms. DeGenarro's medical conditions created her disability. Liberty Life's reviewing physicians at no time considered the totality of her conditions. Rather, Dr. Millstein considered all of her conditions other than the sleep apnea, while Dr. Bradley considered only the sleep apnea. Further, Dr. Weber, Ms. Degennaro's treating physician, after considering all of her conditions, reached a conclusion different from that of Liberty Life. An independent medical exam would have been very useful under these circumstances. Failure to conduct an independent exam in this case weighs in favor of finding that Liberty Life's termination of Ms. DeGennaro's benefits was arbitrary and capricious on this record.

*Opinion of Treating Physician*

Dr. Weber saw Ms. DeGennaro personally and had an opportunity to observe the cumulative effect of her ailments and medications. None of Liberty Life's reviewing physicians had this opportunity, and Liberty Life chose not to conduct an independent exam. While administrators are not required "automatically to accord special weight to the opinions of a claimant's physician," neither may they "arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician." *Black and Decker Disability Plan v. Nord*, 538 U.S. 822, 834 (2003). There is no indication that Liberty Life considered Dr. Weber's comments regarding the cumulative impact of Ms. DeGennaro's conditions and her medications. In overlooking Dr. Weber's comments about these issues without explanation, Liberty Life arbitrarily refused to credit Ms. DeGennaro's reliable evidence.

Liberty Life notes that some of the information it received from Dr. Weber also supported its decision to terminate Ms. DeGennaro's benefits, pointing particularly to the form on which Dr. Weber categorized Ms. DeGennaro as capable of administrative activity. (*See* Mem. of Def. Liberty Life Assurance Co. of Boston in Supp. of Mot. for Entry of J., docket # 20, at 14.) While Dr. Weber's comments on some of the Liberty Life forms could provide support for some of Liberty Life's positions, for the most part Dr. Weber consistently reported that Ms. DeGennaro was unable to work due to her multiple conditions.

Liberty Life's refusal to credit significant portions of Dr. Weber's reports, particularly those concerning the cumulative effect of her conditions and the impact of her medication, weighs in favor of finding that the termination of Ms. DeGennaro's benefits was arbitrary and capricious.

*Potential Conflict of Interest*

In *Calvert*, the court stated, "we must take into consideration the fact that Liberty is acting under a potential conflict of interest because it is both the decision-maker, determining which claims are covered, and the payor of those claims." *Calvert*, 409 F.3d at 292; *accord Glenn v. MetLife*, 461 F.3d 660, 666 (6th Cir. 2006), *cert. granted*, 128 S. Ct. 1117 (2008), *aff'd*, No. 06-923, 2008 WL 2444796 (U.S. June 19, 2008). The Supreme Court's new decision on this point underscores the need for special care in reviewing a benefits denial made by the very insurance company obligated to pay any awarded benefits.

There is no explicit indication in the Administrative Record in Ms. DeGennaro's case that the conflict of interest drove the determination to terminate benefits, but the Court recognizes Liberty Life's inherent conflict of interest and considers it as a factor in this arbitrary and capricious review. When combined with the other factors detailed in this opinion, this factor also weighs in favor of finding the denial of benefits arbitrary and capricious on this record.

*Definition of "Own Occupation"*

Ms. DeGennaro has argued that Liberty Life erroneously categorized her job as sedentary and therefore evaluated her ability to perform her own occupation using inappropriate criteria. (Pl.'s Brief in Supp. of J. on the Record, docket # 18, at 13.) She explained that her job at Spectrum involved standing or walking approximately 60 - 70% of the time. (*Id.*) However, the Spectrum LTD Policy makes clear that Liberty Life construes "own occupation" to mean the participant's occupation "as it is normally performed in the national economy." (A.R. LL-12.) Where a plan administrator has discretion to interpret plan terms, the arbitrary and capricious standard applies to plan administrator's interpretation of "own occupation." *See Osborne v. Hartford Life and Acc. Ins. Co.*, 465 F.3d 296, 299 (2006). The Department of Labor's description of the position of billing clerk indicates that the position is sedentary, as does Spectrum's own description of the position of collections specialist. (Def.'s Response to Pl.'s Brief in Supp. of J. on Record, docket # 22, at 10.) There was nothing arbitrary and capricious about Liberty Life's categorization of Ms. DeGennaro's position as sedentary.

*Impact of Medication*

There is no indication in the record that Liberty Life's physician consultants considered the impact of Ms. DeGennaro's medications. As noted above, in response to Dr. Weber's concern that medication exacerbated Ms. DeGennaro's daytime sleepiness related to her sleep apnea, Dr. Millstein simply deferred to Dr. Bradley's report. But

16

Dr. Bradley's report did not address the effects of Ms. DeGennaro's medications. *See* A.R. LL-386-387. The failure to consider the impact of medication, particularly where a treating physician has opined that the effects of the medication would greatly impede and perhaps eradicate a claimant's ability to work, supports an argument that the benefits determination was arbitrary and capricious. *See Smith v. Continental Cas. Co.*, 450 F.3d 253, 264-65 (6th Cir. 2006).

*Totality of Medical Conditions*

In each of his reports, Dr. Millstein addresses each condition separately, deferring to Dr. Bradley as to the effects of sleep apnea. *See* A.R. LL-178, LL-199. His reports do not convey explicitly that he has considered the interactions among her conditions, which may well be greater than the sum of their parts. Liberty Life was aware of the need to consider her conditions cumulatively; it asked Dr. Millstein to do so. A.R. LL-219. But the record does not show that Dr. Millstein ultimately considered the totality of her conditions, nor does Liberty Life appear to have otherwise considered the cumulative impact of her conditions. Failure to consider the totality of Ms. DeGennaro's conditions weighs in favor of finding Liberty Life's decision to terminate her benefits arbitrary and capricious.

**Conclusion**

Dr. Weber had stated explicitly to Dr. Millstein that the totality of Ms. DeGennaro's conditions and the effects of her medications formed the primary basis for his opinion that she was unable to work. (A.R. LL-180.) Yet there is no indication in the record that

17

Dr. Millstein ultimately considered the cumulative effects of Ms. DeGennaro's conditions. Nor is there any indication that Dr. Millstein took into account the impact of Ms. DeGennaro's many medications.  Liberty Life had the right to conduct an independent medical examination and opted not to do so.  Liberty Life's decision to terminate Ms. DeGennaro's benefits was arbitrary and capricious.

However, it is not clear from this record that Ms. DeGennaro was entitled to continue receiving disability benefits under the Spectrum LTD Plan.  Liberty Life may have reached an appropriate conclusion despite its flawed review.  It is impossible to conclude on this record whether it was proper to terminate Ms. DeGennaro's disability benefits under the Spectrum LTD Plan.  Therefore, the Court will simply vacate the final decision denying benefits and remand the matter back to Liberty Life for a full and fair review of Ms. DeGennaro's disability claim, consistent with this opinion.  *See Smith v. Cont'l Cas. Co.*, 450 F.3d 253, 265 (6th Cir. 2006)

Dated:   June 20, 2008              /s/ Robert J. Jonker
                                    ROBERT J. JONKER
                                    UNITED STATES DISTRICT JUDGE